UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Civil No. 19-cv-81316-MATTHEWMAN

PARTNERS BIOMEDICAL SOLUTIONS, LLC,
a Florida limited liability company, *et al.*,

      Plaintiffs,

vs.

EUGENE SALTSMAN, *et al.*,

      Defendants.

_____/

> FILED BY____KJZ____D.C.
>
> **Sep 17, 2021**
>
> ANGELA E. NOBLE
> CLERK U.S. DIST. CT.
> S. D. OF FLA. - West Palm Beach

## ORDER ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT [DEs 197, 259]

**THIS CAUSE** is before the Court upon Defendants, Benjamin Chevere ("Ben Chevere"), Eugene Saltsman ("Gene"), Evan Saltsman ("Evan"), Alfatwo Holdings, LLC ("Alfatwo") and Matrix Instrument Services, Inc.'s ("Matrix") (collectively, "Defendants") Motion for Partial Summary Judgment [DE 197] and Plaintiffs, Partners Biomedical Solutions, LLC ("PBS") and Plaintiff MAC 15, LLC's ("MAC 15") (collectively, "Plaintiffs") Motion for Partial Summary Judgment [DE 259]. The parties have filed Statements of Material Fact and evidence to support their motions and have responded and replied to each motion for summary judgment. *See* DEs 198, 199, 261, 262, 273, 276, 278, 279, 284, 285, 286, 288, 291, 301, 302, 305, 306. The Court held a hearing on the motions via Zoom video teleconference on August 10, 2021. The matters are now ripe for review, and the Court has carefully considered the filings and attachments thereto and the arguments of the attorneys at the hearing, as well as the entire docket in this case.

1

## I.   <u>BRIEF SUMMARY OF UNDISPUTED FACTS</u>

The following facts are drawn from the uncontested portions of the record together with the parties' respective statements of material facts ("SMF") [DEs 198, 261, 279, 288, 301, 302] and supporting affidavits [DEs 197-1, 197-2, 197-3, 260-13, 273-1, 273-2, 273-3, 273-4, 279-16, 279-17, 285, 286, 290-5].

Gene Saltsman has worked in the biomedical industry since 1979, selling and servicing machine parts to companies that need such parts. [Def. SMF ¶ 1, DE 198 (citing Unsworn[1] Declaration of Eugene Saltsman ("Gene Dec.") ¶ 2, DE 197-2)]. He formed the first of three companies that provided these services in 2006. [*Id.* ¶ 2 (citing Gene Dec. at ¶ 3)]. These three companies were Advanced Lazer Services, Inc., Gulf Coast Instruments, Inc., and Gulf Coast Biomedical, Inc. ("Gulf Coast") [*Id.* ¶ 3 (citing Gene Dec. at ¶3)]. In 2017, Dr. Robert Burke entered into an agreement with Reichel Realty and Investments as broker, in connection with the potential purchase of a business identified in the agreement as Medical Related Bix/Medical Equipment. [*Id.* ¶ 5 (citing Business Brokers of Florida Standard "Confidentiality/Disclosure", DE 1-03)]. The agent for Reichel as selling broker was Steven Friedman ("Mr. Friedman"). [*Id.* ¶ 6 (citing DE 1-03)].

Gene entered into an agreement, dated June 11, 2018, with North American Biomedical Services, LLC ("NABS") entitled Stock Purchase Agreement ("SPA"). [Def. SMF ¶ 7 (citing SPA), DE 21-2]. Gene was the Seller and NABS was the Buyer. [*Id.* (citing SPA at 1)]. The

---

[1] Defendants filed several unsworn declarations due to logistical difficulties caused by the COVID-19 pandemic. As argued by counsel for Defendants at oral argument, these unsworn declarations are entitled to the same weight, force, and effect as sworn declarations. *See Norkunas v. Asian Taste, Inc.*, No. 10-61255-CIV, 2011 WL 13214553, at *2 (S.D. Fla. Feb. 18, 2011). This is because, pursuant to 28 U.S.C. § 1746(2), any rule that requires an affidavit, such as Rule 56(e), can be satisfied by an unsworn declaration as long as it was made under the penalty of perjury. Since the unsworn affidavits relied on by Defendants were made under the penalty of perjury, the Court will consider them.

founding Shareholders of NABS were Louis Weltman ("Weltman") and SEZ Holding Corp. ("SEZ"), a corporation owned by Mr. Friedman. [*Id.* ¶ 9 (citing SPA at 1, Background § F)].

The SPA provided that the purchase price was "[i]n consideration of Seller's sale, assignment, transfer, and delivery to the Buyer of the Securities, and for each other rights and obligations acquired by the Buyer under this Agreement and the Ancillary Agreements…." [Pl. Resp. to Def. SMF, DE 279 (citing SPA, PartnersBiomedical03227 § 2.2)]. The SPA refers to the collective stock of Gulf Coast Biomedical, Gulf Coast Instruments, and Advanced Laser Services as the "Securities." [*Id.*]. The SPA purchase price was "[i]n consideration of Seller's sale, assignment, transfer, and delivery to the Buyer of the Securities, and for each other rights and obligations acquired by the Buyer under this Agreement and the Ancillary Agreements…" and was defined as the payment of Three Million Dollars ($3,000,000.00) to the Seller and issuance to Seller of a 19.99% Membership Interest (the "NABS Membership Interest") in the Buyer. [*Id.* ¶ 10 (citing SPA, PartnersBiomedical03227 § 2.2)]

Gene Saltsman and Gulf Coast entered into an Employment Agreement, which provided that it was entered into as of August 17, 2018. [Def. SMF ¶ 14 (citing Employment Agreement, DE 21-6)]. This Employment Agreement provided that Gene, defined as the Executive, had sold all of the common stock of Gulf Coast (defined in the Employment Agreement as Biomedical) to NABS. [*Id.* ¶ 14 (citing Employment Agreement at 1 at first WHEREAS clause)]. The Employment Agreement provided that it was for a term of five years. [*Id.* ¶ 16 (citing Employment Agreement at ¶1)]. The Employment Agreement at § 6 (Non-Competition Agreement) pertains to non-competition and non-solicitation by the Executive directly, and non-competition and non-solicitation by the Executive indirectly. [*Id.* ¶ 15; Pl. Resp. to Def. SMF ¶ 15 (citing Employment Agreement at §6(a)-(b))]

3

On August 16, 2018, PBS was formed as a Florida Limited Liability Company. [Def. SMF ¶ 17 (citing Counterclaim ¶ 32, DE 21)]. On October 19, 2018, Gene, as "Seller" of NABS and PBS as "Buyer" entered into the Amendment to The Stock Purchase Agreement, whereby NABS assigned its rights and obligations under the SPA to PBS. [Pl. Resp. to Def. SMF ¶ 18 (citing Amendment to the SPA, DE 261-4)]. On October 19, 2018, Alfatwo Holding, LLC, MAC15, Losowe, and SEZ entered into the PBS Operating Agreement ("PBS Operating Agreement") wherein Membership and equity interest in PBS was established as: "Mac15, as Member with 40.01% equity ownership interest; Losowe Capital, Inc. as Member with 25% equity ownership interest; SEZ Holding Corp., as Member with 15% equity ownership interest; and Alfatwo Holdings LLC, as Member with 19.99% equity ownership interest." [*Id.* ¶ 19 (citing PBS Operating Agreement, DE 261-6)]. At all times relevant to this case, Dr. Burke owned and controlled 100% of MAC 15, LLC, and Mr. Weltman owned and controlled 100% of Losowe Capital, Inc. [Def. SMF ¶¶ 20-21 (citing Counterclaim ¶¶ 11, 12)]. Mac15 designated Dr. Burke as Manager of PBS, Losowe designated Mr. Weltman as Manager of PBS, and Gene Saltsman designated himself as Manager of PBS. [Pl. Resp. to Def. SMF ¶ 18 (citing Articles of Organization for Alfatwo Holdings, LLC, DE 261-16)]. The Operating Agreement contains a draft of a thirteen-page document entitled "[NABS] Investment Proposal and Executive Summary." [Def. SMF ¶ 27 (citing PBS Operating Agreement at 43-55)]. It is identified as a "Business Plan" on Exhibit A to the Operating Agreement. [*Id.* (citing PBS Operating Agreement at 42)].

On October 19, 2018, Gene and PBS entered into an Amendment to Stock Purchase Agreement. [Def. SMF ¶ 29 (citing Amendment to the SPA at 1)]. The Amendment to Stock Purchase Agreement provided that all uses of the term "NABS" are intended to mean PBS, and that PBS is defined as Buyer or PBS. [*Id.* (citing Amendment to the SPA at 1)]. The Amendment

4

to Stock Purchase Agreement provides that the Buyer has little fair market value as of closing. [*Id.* ¶ 30 (citing Amendment to the SPA at 1)]. Gene and Gulf Coast entered into the Amendment to Employment Agreement dated October 19, 2018, which provided that Gene would work full-time for Gulf Coast only for the first 120 days and then part-time on an as-needed basis. [*Id.* ¶ 31 (citing Amendment to the Employment Agreement ¶ 3, DE 21-7)]. On October 19, 2018, the "Amended and Restated Post Organization Agreement for Investment and Operation of a Business" was entered into among Gene Saltsman, Alfatwo, Mac15, SEZ and Losowe. [*Id.* ¶ 32 (citing Amended and Restated Post-Org Agreement, DE 279-4].

On or after the Closing Date, five people who had been affiliated with Gene and Gulf Coast, Evan Saltsman, Mike Domingo, David Woods, Michael Loesel, and Mike Field, transitioned to work for Gulf Coast under its new management. [Def. SMF ¶ 33 (citing Counterclaim at 42, ¶ 67)]. Following the Closing Date, Mr. Weltman and Dr. Burke hired new employees for Gulf Coast and/or PBS, including, but not limited to, Robin Dean, Frank West, Michelle Whiteman, Jared Horowitz and Israel Dominguez. [*Id.* ¶ 36 (citing Counterclaim at 42, ¶ 70)].

Evan Saltsman ("Evan") is Gene's son. [Pl. SMF ¶ 43 (citing Depo of Evan, 14: 1-4, DE 261-9)]. In June 2015, Evan began working for his father, Gene, as a field services engineer at Gulf Coast. [*Id.* ¶ 44 (citing Depo of Evan, 14: 1-4)]. On May 16, 2019, Alfatwo resigned as a Member of PBS. [*Id.* ¶ 49 (citing Resignation Letter, DE 1-11)]. Alfatwo was a Member of PBS from October 19, 2018, the Transaction Date, until May 16, 2019, when it resigned. [*Id.* ¶ 50 (citing Resignation Letter)]. On April 19, 2019, Evan had his uncle assist him in forming Matrix. [*Id.* ¶ 52 (citing Depo. of Evan, 40:11-16, 40:19-41; Evan Dec. at ¶ 14, DE 273-3)]. Evan is and has always been the sole owner of Matrix. [*Id.* ¶ 53 (citing Depo. of Evan, 40:24-41:7)]. When

Evan initially formed Matrix, he had no existing customers in the biomedical services field. [*Id.* ¶ 55 (citing Depo. of Evan, 42: 5-10)].

In September 2018, Gene personally purchased a Sakura Coverslipper for $35,000. [Pl.'s SMF ¶ 57 (citing Depo. of Gene, 284: 1-16, 284: 25-28, 285: 6-11, 285: 20-286: 4, 290: 22-291: 1-5, DE 261-1)]. Gene sold the biomedical equipment to a customer of Gulf Coast after the Transaction closed; specifically, on January 14, 2019, he sold a "Sakura Coverslipper" biomedical equipment for $75,000 to Mr. Chu of Downtown Gastro, a known current customer of PBS. [*Id.* ¶ 58 (citing Depo. of Gene, 284: 1-16, 284: 20-22; 284: 25-285:1, 285: 6-11, 285: 20-286: 4, 290: 22-291: 5)]. Additionally, in 2019, Gene personally sold a Leica Cryostate to Advanced Dermatology at Riverhead. [*Id.* ¶ 59 (Depo. of Gene, 292: 12-20)].

Ben Chevere had an oral understanding with Gene that he would receive a 10% finder's fee for practice groups he introduced to Gene. [Def. SMF ¶ 53; Pl. Resp. to Def. SMF ¶ 53 (citing Depo of Chevere, 33: 7-19, DE 197-9)]. He has never seen, been provided with, or had any access to any purported customer list, or any information regarding customers of Gulf Coast Biomedical, Inc., or Gulf Coast Biomedical, LLC, other than those he previously introduced. [Def. SMF ¶ 54 (citing Unsworn Declaration of Benjamin Chevere ("Chevere Decl.") ¶ 18, DE 197-1)]. Ben Chevere never referred any customers to Gulf Cost Instruments, Inc. [*Id.* ¶ 55 (citing Chevere Decl. ¶ 16)]. Ben Chevere never contacted or otherwise corresponded with anyone whom he understood to be one of Gulf Coast Biomedical, Inc.'s existing customers, either before or after October 2018. [*Id.* ¶ 56 (citing Chevere Decl. ¶ 17)]. He is not aware of any customers that either of the Plaintiffs have. [*Id.* ¶59 (citing Chevere Decl. ¶¶ 22-23)]. He has introduced one new customer to Matrix—Sani Medical Lab—which was not doing business with either Gulf Coast

Biomedical, Inc. or Gulf Coast Biomedical, LLC, prior to Ben Chevere referring it to Matrix. [*Id.* ¶62 (citing Chevere Decl. ¶ 28)].

## II.    <u>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DE 197]**</u>

Defendants are seeking summary judgment in favor of Ben Chevere for Counts VIII, X, XI, XII, XIV; in favor of Evan Saltsman and Matrix for Counts VIII, IX, X, XI, XIII, XIV; and in favor of Gene and Alfatwo for Counts VIII, IX, X, XI, XII, XIII. [DE 197 at 1]. The overarching issues are whether Ben Chevere was a party to any agreement that would make the restrictive covenants apply to him; whether Evan Saltsman was an "Affiliate" of PBS as that term is defined in PBS Operating Agreement; and whether Gene Satlsman's actions (and thereby Alfatwo's actions) violated the restrictive covenants. [DE 197].

In their response to Defendants' Motion, Plaintiffs generally argue that Defendants fail to cite to any evidence in the record to support their arguments. [DE 278 at 2]. Because of this, Plaintiffs argue their Motion "is devoid of actual support within Defendants' own Statement of Material Facts. This failing by Defendants leaves their Motion unsupported." *Id.*

In reply, Defendants argue Plaintiffs' "[r]esponse fails to raise any material fact that can enable this Court to find against any of the Defendants on any of the Counts that are the subject of Defendants' Motion as a matter of law." [DE 284 at 1]. Defendants also maintain that the only evidence in support of Plaintiffs' Response is the affidavit of Robert Burke and the Declaration of Robert Saltsman, both of which they allege are defective. *Id.* at 2-3. In reference to soliciting former employees, Defendants argue that "[i]t is inconceivable that under these circumstances, Gene or Evan would plan to leave Gulf Coast, much less plan to take its customers. They would be intentionally attempting to deprive themselves of significant income. . . . [T]he contention about a purported meeting and plan in December of 2018 to take field service engineers (i.e., employees)

7

and customers of Gulf Coast is beyond unreasonable and irrational." *Id.* at 8.

### III.   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [DE 259]

Plaintiffs are seeking summary judgment on Counts I, II, IV, VIII, IX, XI, XIV. [DE 259 at 1]. Some of the main issues raised in the motion pertain to which party materially breached the agreement first and whether certain of the affidavits provided by Defendants are false. [DE 259].

In response, Defendants argue that Plaintiffs produced an Operating Agreement in discovery "which appears to provide Evan a 5% ownership interest in Alfatwo. There is no genuine issue of material fact as to whether Evan was ever an 'Affiliate' of Partners through his ownership or control of Alfatwo. As a result, Evan was not subject to the restrictive covenants in Partners' Operating Agreement." [DE 273 at 2]. Further, they allege Gene's sales of two pieces of medical equipment did not violate the restrictive covenants, and, even if the sales did violate the restrictive covenants, Plaintiffs materially breached the PBS operating agreement prior to Defendants purported breach, which "conclusively pre-empts any possibility of the Plaintiffs' prevailing on Counts I and II." *Id.* at 3-4. Defendants also argue Counts VIII (tortious interference with customer relations), IX (tortious interference with employee and contractor relations), XI (violation of FDUTPA), and Count IV (breach of statutory duty of loyalty) "against Gene and Alfatwo, are based solely upon Gene's sale of the two pieces of equipment. They all rely on Gene allegedly violating the restrictive covenants in the SPA and PBS Operating Agreement, which did not occur." *Id.* at 4. Finally, Defendants point out that Plaintiffs did not provide an argument or evidentiary support for Count XIV (Unjust enrichment and disgorgement). *Id.* at 22-23.

In reply, Plaintiffs assert that Defendants' Response is based entirely on new, self-serving affidavits created in response to Plaintiffs' Motion for Partial Summary Judgment. [DE 291 at 3]. Plaintiffs believe the affidavits are inconsistent with record evidence and also lack corroboration.

8

*Id.* Next, Plaintiffs point out that, pursuant to the January 29, 2021 Order of the Court [DE 257], Defendants are "precluded from relying in any manner whatsoever" on the documents obtained by Mr. Friedman from Dr. Burke's email accounts. *Id.* Plaintiffs accuse Defendants of artificially manufacturing "issues of fact" with the untimely, self-serving affidavits containing conclusory statements. *Id.* at 4. Plaintiffs finally argue that Gene Saltsman's testimony and affidavits are full of false statements of material fact. *Id.*

## IV.    <u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 56(a) states in relevant part that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of demonstrating to the court by reference to the record that there are no genuine issues of material fact that need to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a moving party has discharged its initial burden, the nonmoving party must "go beyond the pleadings," and, by its own affidavits or by "depositions, answers to interrogatories, and admissions on file," identify specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electr. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

When deciding whether summary judgment is appropriate, the Court must view the evidence and all reasonable factual inferences in the light most favorable to the party opposing the motion. *Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1369 (11th Cir. 1998) (citations and

quotations omitted). Any doubts regarding whether a trial is necessary must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

So long as the non-moving party has had an ample opportunity to conduct discovery, the non-movant must come forward with affirmative evidence to support its claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the nonmoving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Anderson*, 477 U.S. 242, 249-50.

## V.    THE COURT'S COMMENTS ON THE GENERAL STATE OF THE SUMMARY JUDGMENT BRIEFING BY BOTH PLAINTIFFS AND DEFENDANTS

The summary judgment briefing in this case was woefully deficient, which has negatively impacted judicial economy. On the one hand, Defendants opted to file a motion for summary judgment, and then requested summary judgment as non-movants under Fed. R. Civ. P. 56(f) as to additional counts in their response to Plaintiffs' motion for summary judgment. Defendants also lumped together several different counts in their papers without clearly explaining which arguments pertained to which specific count(s). [DE 197 at 10-16]. On the other hand, Plaintiffs failed to respond to several of Defendants' arguments in Plaintiffs' reply and then provided the Court with inaccurate charts to "assist" the Court at the hearing. *See* DE 305-1. Additionally, both parties attached arguably self-serving affidavits to their pleadings. Finally, both parties failed to properly refer to specific record evidence throughout their papers and often simply relied on conclusory arguments. All of this has made ruling on the motions unnecessarily time consuming.

# VI. <u>DISCUSSION AND ANALYSIS</u>

## A. <u>Count I: Breach of Contract—Stock Purchase Agreement (against Gene Saltsman)</u>

In their motion for summary judgment, Plaintiffs claim that Gene Saltsman breached the Stock Purchase Agreement when on two occasions in 2019 he personally sold biomedical services equipment to two different customers of PBS. [DE 259 at 5]. Plaintiffs assert they have been damaged and "[p]ursuant to the unambiguous language in the SPA Section 6.5, Plaintiffs are entitled to both injunctive relief and for payment of all profits, compensation, commissions, and remuneration from the competition, as well as from the personal sales of biomedical services equipment by Gene to customers of PBS." *Id.* at 5-6. Plaintiffs further claim that, "pursuant to SPA Section 8.10, Plaintiffs are entitled to 'prevailing Party's attorney's fees and costs'" and that testimony and evidence prove that Gene admitted to making the personal sales after the Closing, such sales violate the non-compete, and this is therefore a material breach. *Id.* at 6.

In response, Defendants argue that summary judgment should not be granted because "Gene's sales of two pieces of medical equipment are not actually breaches of [Section 6.5 of] the SPA" and "Plaintiff's claim is negated by the prior breach rule." [DE 273 at 7]. According to Defendants, Gene's actions did not constitute competition under the SPA and did not violate the non-solicitation covenant (Section 6.5) of the SPA. *Id.* at 7-10. Finally, Defendants maintain that Plaintiffs were not damaged by the sale of the medical equipment. *Id.* at 9-10. Defendants are seeking summary judgment in Gene's favor pursuant to Rule 56(f). *Id.* at 4.

In reply, Plaintiffs assert as to Count I that Defendants admit that they did breach the restrictive covenants "by adopting Defendants' position that their own breaches are excused by alleged first breaches by Plaintiffs." [DE 291 at 8].

11

In order to prove a breach of contract claim, Plaintiffs must establish: "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Merle Wood & Assocs., Inc. v. Trinity Yachts, LLC*, 857 F. Supp. 2d 1294, 1301 (S.D. Fla. 2012) (quoting *Vega v. T-MobileUSA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009)). It is a fundamental principle of Florida contract law that a material breach by one party excuses the performance by the other. *Indemnity Ins. Corp. of DC. v. Caylao*, 130 So.3d 783, 786 (Fla. 1st DCA 2014) (citing 14 STEVEN PLITT ET AL., COUCH ON INSURANCE § 199.81 (3d ed.2012)). A "material breach" is one that goes "to the essence of the contract," as opposed to the mere failure to perform some minor part of the contract. *Covelli Family, L.P. v. ABG5, L.L.C.,* 977 So.2d 749, 752 (Fla. 4th DCA 2008) (citation and quotation marks omitted). "Whether a particular breach is material raises an issue of fact." *Hamilton v. Suntrust Mortg. Inc.*, 6 F. Supp. 3d 1300, 1309 (S.D. Fla. 2014) (citing *Ron Matusalem & Matusa of Fla., Inc. v. Ron Matusalem, Inc.,* 872 F.2d 1547, 1551 (11th Cir.1989)).

Section 6.5 of the SPA states in relevant part:

> The Seller agrees that for a period of three (3) years from the termination of the Employment Agreement, the Seller shall not, for himself or on behalf of any Person other than each of Biomedical, Instrument, or Advanced, for whatever reason (A) engage in any services that are of any type similar or related to the Business anywhere within thirty (30) miles of any Biomedical, Instrument, or Advanced location or (B) solicit the business of any Person who was a customer of Biomedical Instrument or Advanced, at any time during the three (3) years prior to the date of the Closing and/or a customer of any Biomedical, Instrument or Advanced, at any time during the time that this covenant is in effect.

[SPA, DE 261-2]. The term "Business" is defined as "providing on sight equipment repair services to the medical industry." *Id.* at Recital, p. 1.

The Court first notes that, in their reply, Plaintiffs have failed to fully respond to Defendants' arguments regarding Count I. Plaintiffs claim that "Defendants admit that Defendants

did breach the restrictive covenants by adopting Defendants' position that their own breaches are excused by first breaches of Plaintiffs." [DE 291 at 8]. However, this does not end the analysis.

Defendants have established under Section 6.5(A) that Gene did not engage in any services that are of any type similar or related to the Business anywhere **within thirty (30) miles** of any Biomedical, Instrument, or Advanced location. *See* Gene Dec. at ¶¶ 3-4, 54, 58, DE 273-2; responses to interrogatories 1-3 of Robert Burke, DE 19. Plaintiffs have not controverted this evidence or made any representation whatsoever as to the locations of the various relevant entities.

However, Section 6.5 is written in the disjunctive, and Section 6.5(B) also prohibited Gene from "solicit[ing] the business of any Person who was a customer of Biomedical Instrument or Advanced, at any time during the three (3) years prior to the date of the Closing and/or a customer of any Biomedical, Instrument or Advanced, at any time during the time that this covenant is in effect." Defendants argue that, at the time of the sale of the MOSE Cryostat, Advanced Derm at Riverhead was not a former or current customer of Gulf Coast by virtue of the fact that that specific Advanced Derm entity had just been formed. [Gene Dec. at ¶¶ 58, 60, DE 273-2; Chevere Dec. at ¶ 6, DE 273-1]. However, it is clear that Advanced Derm was a customer of Gulf Coast, even if the specific location of Advanced Derm Riverhead was not. *See* Pl. SMF at ¶¶ 59-60, 84-86; Depo of Gene at 294: 13-20; GC Sales by Customer, 2013-2018, DE 261-9. At this juncture, it is impossible for Court to determine if the agreement has been breached as Plaintiffs and Defendants are defining "Advanced Derm" differently. There is also a second factual dispute as to whether Gene solicited Dr. Chu's business. *See* DE 273 at 9; DE 259 at 5; Pl. SMF ¶ 58; Gene Dec. ¶ 55, DE 273-2; Chevere Dec. ¶ 5, DE 273-1.

There are clearly genuine issues of material fact related to whether there was a material breach of the SPA. Therefore, summary judgment shall not be granted in Plaintiffs' or Defendants' favor as to Count I. This Count shall proceed to trial as to Gene Saltsman.

### B. Count II: Breach of Contract—PBS Operating Agreement (against Gene Saltsman, Evan Saltsman, and Alfatwo Holdings, Inc.)

In their motion for summary judgment, Plaintiffs argue that, on October 19, 2018, Gene and Alfatwo entered into the PBS Operating Agreement, and that, per the terms of the PBS Operating Agreement, the members of PBS included Losowe Capital, Inc., SEZ Holding Corp, MAC15, and Alfatwo Holdings, LLC. [DE 259 at 7]. Moreover, according to the Operating Agreement of Alfatwo Holdings, LLC, Evan and Gene Saltsman were co-members of Alfatwo. *Id.* Plaintiffs argue, therefore, that Gene, Alfatwo, and Evan, as "Affiliates of a Member", materially breached Section 2.10 ("Solicitation of Customers or Prospects") and Section 2.9 ("Competition with Biomedical") of the PBS Operating Agreement through Gene's sale of biomedical services equipment on two occasions to two known customers of PBS. *Id.*

Next, Plaintiffs maintain that Evan breached Section 2.9 "by the solicitation and engagement of Woods, Gulf Coast Field Service Engineer, to assist Evan obtain clients for Matrix and the solicitation and engagement of Woods to perform biomedical equipment services on for Evan and Matrix." [DE 259 at 9]. Plaintiffs assert that Alfatwo resigned as a Member of PBS on May 16, 2019, and, for 24 months following the resignation of Alfatwo, Evan was bound by the restrictive covenant of PBS Operating Section 2.9. *Id.*

Finally, Plaintiffs contend that Evan and Alfatwo materially beached Section 2.10 ("Solicitation of Customers or Prospects") and Section 2.12 ("Solicitation of Employees and Contractors") of the PBS Operating Agreement. [DE 259 at 10]. Plaintiffs argue that, by the terms

14

of the restrictive covenant, Evan, as an Affiliate of Alfatwo and Gene, remained bound by the restrictive covenant for 24 months after Alfatwo's May 16, 2019 resignation as a Member of PBS. *Id.* According to Plaintiffs, Evan expressly acknowledges approaching and soliciting the business of several customers who Evan knew were, at that time, customers of Gulf Coast-owned PBS. *Id.* Plaintiffs claim that "Matrix has received substantial compensation from Gulf Coast clients which Matrix solicited and serviced. . . .Those revenues and profits diverted to Matrix contractually belong to PBS as Defendants were bound not to compete." *Id.* at 11.

In response, Defendants argue that the sales of the Coverslipper and MOSE Cryostat by Gene, Evan, and Alfatwo "did not cause Gene and Alfa Two to violate the restrictive covenants set forth in §§ 2.9 and 2.10 of the Operating Agreement." [DE 273 at 10]. Defendants also claim that the prior breach rule prohibits Plaintiffs' claims against Gene in Count II. *Id.* at 12-14. Finally, they argue that the restrictive covenants do not apply to Evan because he does not meet the definition of the term "Affiliate" pursuant to Section 1.2(b). *Id.* at 15. Defendants are seeking summary judgment in Evan's, Gene's and Alfatwo's favor pursuant to Rule 56(f). *Id.* at 2, 4.

In reply, Plaintiffs assert as to Count II that Defendants had admitted that they did, in fact, breach the restrictive covenants "by adopting Defendants' position that their own breaches are excused by alleged first breaches by Plaintiffs." [DE 291 at 8]. Plaintiffs also argue that an alleged lack of knowledge does not excuse performance by Defendants. *Id.*

Section 2.9 of the PBS Operating Agreement states in relevant part that

. . . each of such Member and such Member's Affiliates (the "Restricted Parties") shall not, directly or indirectly, compete with the Company or any of the Company's Affiliates, including without limitation by engaging, directly or indirectly, as an employee, officer, director, partner, shareholder, owner, member, agent or independent contractor, in a business in the same or similar industry or industries currently or during the Restricted Period conducted, or planned to be conducted, by the Company or any of its Affiliates anywhere in the United States.

15

[PBS Operating Agreement, DE 261-6].

Section 2.10 states in relevant part that

. . . the Restricted Parties shall not seek business from any Customer or Prospect (as defined below) on behalf of any enterprise or business other than the Company and its Affiliates, refer any business from any Customer or Prospect to any enterprise or business other than the Company and its Affiliates or receive commissions based on sales or otherwise relating to the business from any Customer or Prospect from any enterprise or business other than the Company and its Affiliates. . . ."

[PBS Operating Agreement, DE 261-6].

Finally, Section 2.12 states in relevant part:

The Company and its Affiliates have made, and will continue to make, a significant investment in developing and training a competent work force. Each Restricted Party acknowledges that the scope of the abilities of, and compensation paid to, the Company's various employees is valuable and confidential information. Further, such Restricted Party acknowledges that the Company's continued viability and success is in large part contingent upon maintaining a stable, trained and competent work force in itself and the Affiliates of the Company. During the Restricted Period, such Restricted Party will not directly or indirectly solicit, entice, encourage, or cause, any employee or independent contractor of the Company or any Company Affiliate to terminate such employment or independent contractor status with the Company or its Affiliates. Further during the Restricted Period, such Restricted Party will not directly or indirectly hire, or cause another Person to hire any Person who is, or was an employee or independent contractor of the Company or its Affiliates at any time during the Restricted Period, unless such employee's or independent contractor's status as an employee or independent contract of the Company or its Affiliates has been terminated for at least six (6) months preceding such hiring.

As an initial matter, the Court will consider whether Evan Saltsman qualifies as an "Affiliate" under the PBS Operating Agreement. An "Affiliate" is defined in the PBS Operating Agreement as follows:

(a) any Person who, directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with the specified Member; (b) any Person who is an officer, partners in or trustee of, or serves in a similar capacity with respect to, the specified Member or of which the specified Member

16

is an officer, partner, or trustee, or with respect to which the specified Member serves in a similar capacity, or (c) any person who, directly or indirectly, is the beneficial owner of more than ten (10%) percent of any class of equity securities of, or otherwise has a substantial beneficial interest in, the specified Member or of which the specified Member is, directly or indirectly, the owner of more than ten (10%) percent of any class of equity securities or in which the specified Member has a substantial beneficial interest.

[PBS Operating Agreement, Ar. 1 ¶ 1.2(b), DE 261-6]. Plaintiffs claim that Evan is an "Affiliate" under subsections (a), (b), and (c) of the definition of "Affiliate" and rely on the Privilege Log of Nelson Mullins Riley & Scarborough LLP [DE 279-3] and the Operating Agreement of Alfatwo Holdings, LLC [DE 261-7] to support their argument. Defendants rely on the Unsworn Declaration of Evan Saltsman [DE 273-3] in support of their position.

As to subsection (a), the privilege log describes emails to and from Evan, who is a partner of Alfatwo; however, the Court simply cannot find that those emails sufficiently establish that Evan directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with Alfatwo. Moreover, despite Plaintiffs' argument to the contrary, Evan's affidavit controverts any circumstantial evidence regarding his control of Alfatwo. [Dec. of Evan Saltsman at ¶¶ 5-6, 12, DE 273-3]. With regard to subsection (c), it is undisputed that Evan is not the beneficial owner of more than 10% of any class of securities equity of Alfatwo. Plaintiffs argue that Evan "directly or indirectly . . . otherwise has a substantial beneficial interest in" Alfatwo. A plain reading of the Operating Agreement of Alfatwo shows that Evan only has a 5% ownership interest in Alfatwo. Furthermore, the Operating Agreement does not establish that Evan has a "substantial beneficial interest" (an inherently vague phrase) in Alfatwo. With regard to subsection (b), there is no evidence Evan is an officer of, partner in or trustee of, or serves in a similar capacity with respect to, Alfatwo. In fact, the only relevant evidence establishes that he has no such role. [Dec. of Evan Saltsman at ¶¶ 8-9, DE 273-3]. Thus, the Court finds that Evan

17

Saltsman is not bound by the restrictive covenants set forth in the PBS Operating Agreement. Summary judgment shall be granted in favor of Evan Saltsman as to Count II.

The Court has also considered Count II with regard to Gene and Alfatwo. There are genuine issues of material fact as to whether Gene's sale of the two pieces of medical equipment violated Section 2.09, 2.10, and/or 2.12. More specifically, there are genuine issues of material fact as to whether Gene solicited anyone and, if he did solicit Dr. Chu or Advanced Derm Riverhead, whether he did so on behalf of an enterprise or business other than Partners, Gulf Coast or Alfatwo. *See* Gene Dec. at ¶¶ 55, 58, DE 273-2; Chevere Dec. at ¶¶ 5-6, DE 273-1.

In addition to the factual disputes recited above, the parties have asked the Court to determine whether the prior breach rule applies in this case. In their papers, Defendants have listed several alleged breaches of the Post Org. Agreement committed by Plaintiffs, which Defendants assert relieved them of their duty to comply with the various contracts. [DE 273 at 13-14]. At the August 10, 2021 hearing, both Plaintiffs' counsel and Defendants' counsel argued that the Court must make the determination about whether the prior breach rule applies at the summary judgment stage. However, counsel for Plaintiffs argued that their alleged prior breaches were ministerial, while counsel for Defendants argued that the prior breaches were material. The Court cannot, at this time, determine whether the application of the prior breach rule applies. First, there are genuine issues of material fact as to whether Gene Saltsman was aware of the alleged prior breaches of Plaintiffs. [Gene Dec. at ¶¶ 33-49, DE 273-2; Fourth Aff. of Dr. Burke at ¶ 6-12, DE 290-5]. Second, the Court cannot make a finding as to whether the various prior breaches were material or de minimus on the factual record that has been presented. Third, the timing of the various alleged breaches by the different parties does not conclusively establish whether the prior breach rule

18

applies here. Therefore, summary judgment shall be denied as to Gene and Alfatwo as to Count II. This Count shall proceed to trial only against Gene and Alfatwo.

    C. <u>Count IV: Breach of Co-Members' Statutory Duties of Loyalty, F.S. § 605.04091 (against Gene Saltsman, Evan Saltsman, and Alfatwo Holdings, Inc.)</u>

Plaintiffs argue in their motion for summary judgment that, as a matter of law, Defendants breached their statutory fiduciary duties, duties not to compete, and their duties of good faith and fair dealing by breaching the PBS Operating Agreement covenants of non-competition and non-solicitation of Gulf Coast customers, prospective customers, employees, and contractors. [DE 259 at 19]. Plaintiffs further argue that the PBS Operating Agreement "did not eliminate nor modify those statutory duties of care and loyalty." *Id.* at 18.

In response, Defendants contend that Evan had "no statutory duty of loyalty or obligation of good faith and fair dealings to Partners." [DE 273 at 16]. Defendants further argue that "[w]hile Alfa Two was a Member of Partners and Gene was an Affiliate, through his control and ownership of Alfa Two, both complied with their duty of loyalty and good faith and fair dealing." *Id.* Defendants are seeking summary judgment in Evan's, Gene's, and Alfatwo's favor pursuant to Rule 56(f). *Id.* at 2, 4.

Fla. Stat. 605.04901 states that "[e]ach manager of a manager-managed limited liability company and member of a member-managed limited liability company owes fiduciary duties of loyalty and care to the limited liability company and members of the limited liability company." Fla. Stat. § 605.04091(1).

For the same reasons described earlier in this Order, summary judgment shall be granted in Evan Saltsman's favor as he was not bound by the restrictive covenants in the PBS Operating Agreement.

However, as to Alfatwo and Gene, there are genuine issues of material fact remaining as to whether they complied with their duty of loyalty and good faith and fair dealing. Furthermore, Plaintiffs cite to no record evidence to support the arguments in their motion [DE 259 at 18-19], and Defendants rely on the premise that Gene did not breach any restrictive covenants [DE 273 at 17], which the Court has already stated cannot be determined at this juncture. Thus, summary judgment should not be granted for or against Alfatwo or Gene Saltsman. This count shall proceed to trial only as to Alfatwo and Gene Saltsman.

      D.   <u>Count VIII: Tortious Interference with Customer Relations (against Gene Saltsman, Evan Saltsman, Alfatwo Holdings, Inc., Matrix and Chevere)</u>

<u>Plaintiffs' motion:</u>

Plaintiffs argue that summary judgment should be granted in their favor against Evan because his testimony establishes his intentional solicitation of business from several customers known at the time of Evan's solicitation to be customers of PBS. [DE 259 at 13-14]. Plaintiffs contend that Evan's intentional interference was unjustifiable and directly violated the PBS Operating Agreement Section 2.10 and that Evan, as Member and Affiliate of Alfatwo, was bound by the restrictive covenants of the PBS Operating Agreement Section 2.10. *Id.* at 14.

Plaintiffs also argue that summary judgment should be granted in their favor against Gene because, in January 2019, he intentionally and unjustifiably sold biomedical services equipment for his own benefit to Dr. Chu. [DE 259 at 15]. Plaintiffs point out that Gene admits that he also sold biomedical services equipment to Advanced Dermatology in 2019 and admits to assisting Evan with the Matrix business. *Id.* Plaintiffs assert that Gene's intentional interference was unjustifiable and directly contravened the non-competition provision of the SPA and violated

Section 2.10 of the PBS Operating Agreement. *Id.* Finally, they argue that Gene and Evan's conduct damaged them. *Id.* at 16.

Defendants respond that Evan was never subject to any restrictive covenants and had the right to lawfully compete with Gulf Coast and PBS. [DE 273 at 18]. They next assert that Gene's sale of two pieces of medical equipment did not violate any non-competition or non-solicitation provisions and that Gene never assisted Evan with Matrix. *Id.* Defendants also maintain that Plaintiff cannot establish the damages element of Count VIII against Gene. *Id.* at 19. Defendants are seeking summary judgment in Evan's, Matrix's, and Gene's favor pursuant to Rule 56(f). *Id.* at 2, 4, 19.

<u>Defendants' motion:</u>

Defendants argue that Ben Chevere is an employee of a company named Advanced Dermatology, a customer of Gulf Coast. [DE 197 at 3, 11]. According to Defendants, Ben Chevere never had any communications after the Closing Date with any of Gulf Coast's customers other than Evan Saltsman and never induced any customers to cease doing business with Gulf Coast and take their business to Matrix. *Id.* at 4-5. Defendants explain that, while Evan did induce some customers to use Matrix, he was under no obligation to refrain from doing so. *Id.* at 5. This is because, while Gene had non-compete and non-solicitation agreements with PBS and Gulf Coast, there is no record evidence which shows that Gene, individually or through Alfatwo or any other entity, induced any customers to leave Gulf Coast and join Matrix. *Id.*

Defendants further assert a competition privilege and a protection privilege. [DE 197 at 15-16]. Finally, they contend that, while Evan and Matrix did contact some Gulf Coast customers and ask them to join Matrix, Evan was under no contractual obligation not to do so, and his actions are protected by the competition privilege. *Id.* at 15. Furthermore, to the extent that Evan did contact

21

customers who had previously done business with Gulf Coast and asked them to use Matrix instead, such actions were proper, justified, and privileged. *Id.* at 16. Defendants maintain that, because of Plaintiffs' own actions, Evan was forced to open up his own company and compete against the Plaintiffs in the field he had been in for the last five years. *Id.*

In response, Plaintiffs first argue that, "[a]t the time of PBS's purchase of Gulf Coast, Gulf Coast had numerous on-going, identifiable business relationships to customers with whom Gulf Coast regularly and continuously provided biomedical equipment services, annual biomedical equipment service repairs, and consumables." [DE 278 at 4]. Plaintiffs next argue Gene and Evan had knowledge of the existing business relationships with those customers. *Id.* at 5. According to Plaintiffs, Evan and Matrix were bound by the PBS Operating Agreement as affiliates of Alfatwo, and Evan intentionally solicited business from several customers known at the time of Evan's solicitation to be customers of Gulf Coast and PBS. *Id.* at 6-8.

Plaintiffs further argue that Gene "intentionally and unjustifiably sold biomedical services equipment, for the benefit of Gene, to Dr. Chu. *Id.* Further, Gene admits that he also sold biomedical services equipment to Advanced Dermatology in 2019." [DE 278 at 8]. Plaintiffs point out that Gene admitted under oath to assisting Evan with the Matrix business. *Id.* Therefore, a reasonable jury would be able to conclude that Gene's intentional interference was unjustifiable, and the question is one for the jury. *Id.* Plaintiffs assert that Gene's and Evan'sadmissions demonstrate that they violated Section 6.5 of the SPA, as well as that they violated Section 2.10 of the PBS Operating Agreement. *Id.* at 8-9. Finally, they maintain that Plaintiffs were damaged by the conduct of Evan and Gene. *Id.* at 9-10.

In reply, Defendants reiterate that Mr. Chevere "had every right to take Advanced Dermatology's business elsewhere . . . . Even if Chevere was a competitor, which he was not,

Chevere was not a party to any agreement with Partners, and its Members or Affiliates, including Gulf Coast, which contained any restrictive covenants that would prevent him or Advanced Dermatology from competing with Gulf Coast, or soliciting Gulf Coast's customers or employees." [DE 284 at 9]. Defendants argue, with regard to Evan and Matrix, that Evan "was not bound by any restrictive covenant which would prevent him from competing, soliciting customers or soliciting employees as a matter of law and was not a party to the SPA." *Id.* at 10. Finally, Defendants argue that, with regard to Gene and Alfatwo, "selling two pieces of medical equipment did not violate the restrictive covenants to which Gene of Alfatwo may have been subject." *Id.* at 11. Moreover, even if the sale of medical equipment violated one or more of the restrictive covenants, "such a breach was excused by Plaintiffs' multiple, prior, material breaches, including but not limited to breaches of the Partners Operating Agreement, the Post Org. Agreement, and the Promissory Note and Pledge Agreement in favor of Gene." *Id.*

The elements of tortious interference with a business relationship are: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Pilkington v. United Airlines*, 112 F.3d 1532, 1540 (11th Cir. 1997) (citation omitted); *AMG Trade & Distribution, LLC v. Nissan N. Am., Inc.*, No. 18-60062-CIV, 2019 WL 11583368, at *3 (S.D. Fla. May 17, 2019), *aff'd*, 813 F. App'x 403 (11th Cir. 2020).

Under the first prong of a tortious interference claim, "the plaintiff may allege tortious interference with present or prospective customers but no cause of action exists for tortious interference with a business's relationship to the community at large." *ThermoLife Int'l LLC v. Vital Pharms. Inc.*, No. 19-CV-61380, 2020 WL 409594, at *3 (S.D. Fla. Jan. 24,

23

2020) (quoting *Coach Servs., Inc. v. 777 Lucky Accessories, Inc.*, 752 F. Supp. 2d 1271, 1273 (S.D. Fla. 2010)). "Intent, the third element, is crucial to a claim for tortious interference; the interference must be 'direct and intentional.'" *Stanley Indus. of S. Fla., Inc. v. AIM Garments Corp.*, No. 16-62658-CIV, 2019 WL 2009336, at *3 (S.D. Fla. Mar. 15, 2019) (quoting *Rockledge Mall Associates, Ltd. v. Custom Fences of South Florida*, 779 So. 2d 554, 557 (Fla. 5th DCA 2001)). "There is no such thing as a cause of action for interference which is only negligently or consequentially effected." *Ethyl Corp. v. Balter*, 386 So. 2d 1220, 1224 (Fla. 3d DCA 1980) (citations omitted).

"Florida law recognizes the right of competitors to compete for customers." *Int'l Sales & Serv., Inc. v. Austral Insulated Products, Inc.*, 262 F.3d 1152, 1158 (11th Cir. 2001) (citing *Wackenhut Corp. v. Maimone*, 389 So.2d 656, 658 (Fla. 4th DCA 1980)). However, the privilege is not available to competitors who employ "improper means." *Id.* at 1159 (noting that the second element of the competition privilege is that the competitor "did not employ improper means"). "Whether interference with a business relationship is privileged 'depends upon a balancing of the importance ... of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances among which the methods and means used and the relation of the parties are important.'" *Id.* at 1159 (quoting *Heavener, Ogier Servs., Inc. v. R.W. Florida Region, Inc.*, 418 So.2d 1074, 1076 (Fla. 5th DCA 1982)). "When there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question." *USI Ins. Servs. LLC v. Simokonis*, No. 15-CV-24337, 2016 WL 11547701, at *15 (S.D. Fla. Apr. 15, 2016), *report and*

*recommendation adopted,* No. 15-24337-CIV, 2016 WL 11547699 (S.D. Fla. May 13, 2016);

(quoting *Mfg. Research Corp. v. Greenlee Tool Co.*, 693 F.2d 1037, 1040 (11th Cir. 1982)).

Additionally, "Florida law recognizes the principle that actions taken to safeguard or protect one's financial interest, so long as improper means are not employed, are privileged." *Johnson Enterprises of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1321–22 (11th Cir. 1998) (citing *Ethyl Corp. v. Balter*, 386 So.2d 1220, 1225 (Fla. 3d DCA 1980); *Babson Bros. Co. v. Allison*, 337 So.2d 848, 850 (Fla. 1st DCA 1976)). Therefore, "a party's interference with another's business relationship is justified where the 'defendant is not a stranger to a business relationship [or] if the defendant has any beneficial or economic interest in, or control over, that relationship.'" *Haney v. PGA Tour, Inc.*, No. 19-CIV-63108-RAR, 2020 WL 6470157, at *2 (S.D. Fla. Mar. 30, 2020) (quoting *Treco Int'l S.A. v. Kromka,* 706 F. Supp. 2d 1283, 1289 (S.D. Fla. 2010)).

As to Ben Chevere, Plaintiff has only provided the following evidence:

122. In 2017, the year preceding Burke's investment in Gulf Coast, Ben Cheverem[2] accounted for $ 94,715 of Gulf Coast sales by customer. [Exhibit 15, Gulf Coast Sales By Customer 2017-2018, SALTSMAN3287]

123. By 2018, the year Burke decided to invest in Gulf C[o]ast, Ben Cheverem accounted for $ 75,235 of Gulf Coast sales by customer. [Exhibit 15, Gulf Coast Sales By Customer 2017-2018, SALTSMAN3287]

124. Evan was first introduced to Ben Cheverem while Evan was a Field Service Engineer at Gulf Coast. [Exhibit 8, Depo. of Evan, 55:19-13]

125. Nonetheless, despite Evan's knowledge that Ben Cheverem was a customer of Gulf Coast, Evan, on behalf of himself and Matrix, solicited the business of Ben Cheverem. [Exhibit 8, Depo. of Evan, 69:13-17]

[Pl. SMF, DE 261 at 19].

---

[2] Plaintiffs refer to this defendant as "Ben Cheverem (a/k/a Ben Chevere)" in this SMF. [DE 261 at 19].

Defendants argue that Ben Chevere does not have any relationship with Plaintiffs except that he worked for Advanced Derm, a customer of Gulf Coast; Chevere permissibly caused Advanced Derm to stop doing business with Gulf Coast; Chevere has not induced any other company to stop doing business with Gulf Coast; and Chevere did not cause any of Plaintiffs' independent contractors or employees to stop working for Plaintiffs or Gulf Coast and start working for Matrix, himself, Advanced Derm, or any other company. [DE 197 at 11].

Plaintiffs failed to respond to these arguments in their response to Defendants' motion and thus have waived any arguments regarding Chevere. Plaintiffs have similarly failed to specify any basis whatsoever for granting summary judgment in their favor as to Chevere in their own motion [DE 259 at 13-16], again resulting in waiver. Furthermore, the limited evidence Plaintiffs cited in their Statement of Material Facts regarding Chevere (and which Plaintiffs' counsel acknowledged at the August 10, 2021 hearing is the relevant evidence for the Court's consideration) does not establish the elements of tortious interference—i.e. the existence of a business relationship, knowledge of the relationship on the part of Chevere, an intentional and unjustified interference with the relationship by Chevere, or damage to Plaintiffs as a result of the breach of the relationship. Furthermore, it is undisputed that Sina Medical Laboratories, the one new customer Chevere introduced to Matrix, did not have an existing business relationship with Gulf Coast. [Evan Dec. ¶¶ 19-20, DE 197-3]. Summary judgment therefore shall be granted in favor of Chevere as to Count VIII.

In Plaintiffs' motion for summary judgment and in their response to Defendants' motion for summary judgment, Plaintiffs only actually allege and attempt to support with evidence Gene and Evan's knowledge of existing business relationships with particular clients, Gene and Evan's intentional and unjustifiable interference with those business relationships, and damage caused by

26

Evan and Gene. [DE 259 at 11-16; DE 278 at 3-10]. Additionally, Plaintiffs make no argument that Evan's conduct should be imputed to Matrix and that Gene's should be imputed to Alfatwo. *See id.* Given Plaintiffs' waiver of any argument regarding Alfatwo and Matrix as to Count VIII, as well as their failure to cite record evidence in their briefs in support of summary judgment or in opposition to Defendants' motion for summary judgment as to Alfatwo and Matrix, summary judgment shall be granted in favor of Alfatwo and Matrix as to Count VIII.

Next, with regard to Evan Saltsman, Plaintiffs argue in their motion for summary judgment that "Evan's intentional interference was unjustifiable and directly violated the PBS Operating Agreement Section 2.20 Solicitation of Customers or Prospects…Evan, as Member and Affiliate of Alfatwo, now and at the time of the solicitation, is bound by the restrictive covenants of the PBS Operating Agreement Section 2.10…. By his own testimony, Evan, in direct violation of the PBS Operating Agreement, intentionally and unjustifiably interfered with known PBS customer relationships." [DE 259 at 15]. Plaintiffs make the same general argument in response to Defendants' motion for summary judgment. [DE 278 at 5-8]. In other words, Plaintiffs contend that Evan's alleged violation of the PBS Operating Agreement constitutes proof that he intentionally and unjustifiably interfered with known customer relationships. However, since the Court has already determined that Evan Saltsman was never bound by the PBS Operating Agreement since he does not qualify as an "Affiliate," Plaintiffs cannot prove one of the elements of intentional interference. Summary judgment shall be granted in favor of Evan Saltsman as to Count VIII.

Finally, with regard to Gene Saltsman, there are issues of material fact as to whether Gene engaged in an intentional and unjustified interference with Plaintiffs' business relationships with its clients, and as to whether Plaintiffs suffered any damage as a result of any breach of the

27

relationship. The Court found earlier in this Order that there are genuine issues of material fact as to whether Gene's conduct in two sales of biomedical equipment violated the SPA and PBS Operating Agreement or actually damaged Plaintiffs. Furthermore, as stated above, the Court cannot make a legal finding as to the applicability of the prior breach rule at this juncture. Finally, there are genuine issues of material fact as to whether Gene's conduct was justified and/or privileged. Therefore, summary judgment shall not be granted in favor of Gene Saltsman as to Count VIII, and, likewise, shall not be granted in favor of Plaintiffs against Gene on Count VIII. This Count shall proceed to trial only against Gene Saltsman.

      E.  <u>Count IX: Tortious Interference with Employee and Contractor Contractual Relations (against Gene Saltsman, Evan Saltsman, Alfatwo Holdings, Inc., and Matrix)</u>

<u>Plaintiffs' motion:</u>

In their motion, Plaintiffs argue in favor of summary judgment on Count IX that "[t]he solicitation of Woods and Fields, and departure of Evan, all of whom were critical Field Service Engineers was highly detrimental to the ability of PBS to continue to operate and to consummate its business plan objectives." [DE 259 at 17]. They further argue that "Evan's intentional solicitation of Woods was unjustifiable and a direct violation of Section 2.9 of the PBS Operating Agreement. . . . As a matter of law, then, Defendants were bound by their knowledge of the existing agreements of PBS with the Field Service Engineers, yet interfered with those agreements, to the detriment of PBS." *Id.* Plaintiffs contend that they were damaged by the "unjustifiable intentional interference with PBS business relationship with Woods." *Id.*

Defendants respond that the factual basis for this claim relates only to Evan and Matrix, and not to Gene and Alfatwo. [DE 273 at 20]. They next argue that Evan is not subject to any restrictive covenants, and, since Evan and Matrix had the right to solicit Woods and Fields,

28

Plaintiffs cannot establish an intentional and unjust interference with a relationship. *Id.* Finally, Defendants state that no facts support the claim that Evan solicited Fields at all. *Id.* Defendants are seeking summary judgment in Evan's, Gene's and Matrix's favor on Count IX pursuant to Rule 56(f). *Id.* at 2, 4, 20.

Defendants' motion:

Defendants argue that Ben Chevere is an employee of Advanced Dermatology, a customer of Gulf Coast. [DE 197 at 3, 11]. According to Defendants, Chevere never induced any employees or former employees to cease doing business with Gulf Coast and take their business to Matrix. *Id.* at 4-5. Defendants explain that, while Gene had non-compete and non-solicitation agreements with PBS and Gulf Coast, there is no record evidence which shows that Gene, individually or through Alfatwo or any other entity, induced any independent contractors to leave Gulf Coast and join Matrix. *Id.* They also argue that the employees who left Gulf Coast, including Woods, had no written agreements and left Gulf Coast due to Plaintiffs' mismanagement of the company. *Id.* at 12.

In response, Plaintiffs claim Field Service Engineers Woods and Fields had a business relationship with Gulf Coast, Evan was aware of that relationship, and Evan intentionally solicited Woods and Fields in violation of Section 2.9 of the PBS Operating Agreement, entitled "Competition with Biomedical." [DE 278 at 10-11]. Plaintiffs only argue in their response that Gene and Evan interfered with the contractual relationship and solicited the Field Service Engineers. *Id.* at 10.

Defendants reply that Ben Chevere was employed by a customer of Gulf Coast (Advanced Dermatology) and did not compete with it. [DE 284 at 9]. They also argue that neither Chevere nor Evan were bound by any restrictive covenants. *Id.* at 9-10. With regard to Gene and Alfatwo,

Defendants maintain that selling two pieces of medical equipment did not violate the restrictive covenants that that Plaintiffs made prior, material breaches. *Id.* at 11.

In their motion for summary judgment and in their response to Defendants' motion for partial summary judgment, Plaintiffs make no assertions that anyone other than Evan solicited two Field Services Engineers (Wood and Fields). [DE 259 at 16-18; DE 278 at 10-11]. Given Plaintiffs' waiver of any argument regarding Gene, Alfatwo, and Matrix as to Count IX, as well as their failure to cite record evidence in support of summary judgment or in opposition to Defendants' motion for summary judgment as to Gene, Alfatwo, and Matrix, summary judgment shall be granted in favor of Gene, Alfatwo, and Matrix as to Count IX.

With regard to Count IX as to Evan Saltsman, as in Count VIII, Plaintiffs again argue that the evidence of Evan's intentional and unjustifiable interference of contractual relationships between Plaintiffs and their employees is that Evan's conduct violated the PBS Operating Agreement. However, since the Court finds that Evan was never bound by the PBS Operating Agreement, Plaintiffs cannot establish an essential element of tortious interference. Moreover, Defendants have established that summary judgment should be granted as to Count IX as a matter of law.

Based on the foregoing, summary judgment is granted in favor of Gene Saltsman, Evan Saltsman, Alfatwo Holdings, Inc., and Matrix as to Count IX. This Count shall not proceed to trial.

F. Count X: Conspiracy to Interfere with Contract, to Interfere with other Relations and to Prevent Competition (against Gene Saltsman, Evan Saltsman, and Ben Chevere)

In their motion for summary judgment as to Count X, Defendants argue that Ben Chevere never had any communications after the Closing Date with any of Gulf Coast's customers other than Evan Saltsman and never induced any customers to cease doing business with Gulf Coast and

30

take their business to Matrix. *Id.* at 4-5. Defendants explain that, while Evan did induce some customers to use Matrix, he was under no obligation to refrain from doing so. *Id.* at 5. This is because, while Gene had non-compete and non-solicitation agreements with PBS and Gulf Coast, there is no record evidence which shows that Gene, individually or through Alfatwo or any other entity, induced any customers to leave Gulf Coast and join Matrix. *Id.*

Defendants further assert a competition privilege and a protection privilege. [DE 197 at 15-16]. Finally, they contend that, while Evan and Matrix did contact some Gulf Coast customers and asked them to join Matrix, Evan was under no contractual obligation not to do so, and his actions are protected by the competition privilege. *Id.* at 15. Furthermore, to the extent that Evan did contact customers who had previously done business with Gulf Coast and asked them to use Matrix instead, such actions were proper, justified, and privileged. *Id.* at p. 16. Defendants maintain that, because of Plaintiffs' own actions, Evan was forced to open up his own company and compete against Plaintiffs in the field he had been in for the last five years. *Id.*

In response, Plaintiffs argue that "Defendants fail to put forth any argument or case law, nor pin citations to record evidence, that address or provide any basis for this request." [DE 278 at 12]. Plaintiffs further cite to Robert Saltsman's affidavit for evidence that "in December 2018 Gene, Evan, and Dave discussed a plan they had made to take the customers and field service engineers from Gulf Coast. . . . Robert [Saltsman] further avers that before Matrix was ever formed, Gene and Evan obtained assurance from Ben Chevere that Ben would send the business of Advanced Dermatology Gene and Evan's way should they leave Gulf Coast." *Id.* at 12-13.

In reply, Defendants reiterate that Mr. Chevere "had every right to take Advanced Dermatology's business elsewhere . . . . Even if Chevere was a competitor, which he was not, Chevere was not a party to any agreement with Partners, and its Members or Affiliates, including

31

Gulf Coast, which contained any restrictive covenants that would prevent him or Advanced Dermatology from competing with Gulf Coast, or soliciting Gulf Coast's customers or employees." [DE 284 at 9]. Defendants argue with regard to Evan and Matrix that Evan "was not bound by any restrictive covenant which would prevent him from competing, soliciting customers or soliciting employees as a matter of law and was not a party to the SPA." *Id.* at 10. Finally, Defendants argue that, with regard to Gene and Alfatwo, "selling two pieces of medical equipment did not violate the restrictive covenants to which Gene of Alfatwo may have been subject." *Id.* at 11. Moreover, even if the sale of medical equipment violated one or more of the restrictive covenants, "such a breach was excused by Plaintiffs' multiple, prior, material breaches, including but not limited to breaches of the Partners Operating Agreement, the Post Org. Agreement, and the Promissory Note and Pledge Agreement in favor of Gene." *Id.* According to Defendants, even if the Court draws an inference from the evidence that Evan participated in a conspiracy, "no reasonable jury would find against Evan or Matrix, because Evan had every right to compete. *Id.* at 10. As matter of law, Evan could not have been a party to a conspiracy. . . . No reasonable jury would believe that there was ever an agreement between Gene, Evan and anyone else in December 2018 to do anything legal or not in view of the circumstances that were present at that time." *Id.*

The elements of a civil conspiracy are as follows: (a) an agreement among two or more persons; (b) to do something legal in an illegal manner or do something illegal; (c) the doing of some overt act in pursuance of the conspiracy; and (d) damages to the Plaintiff. *Honig v. Kornfeld,* 339 F.Supp.3d 1323, 1345 (S.D. Fla. 2018).

It should be noted that Defendants very poorly briefed their argument as to Count X in their motion for partial summary judgment. [DE 197 at 10-16]. Plaintiffs argue in response to Defendants' motion for summary judgment that, in light of the record evidence, "a jury could

32

reasonably conclude that the Defendants conspired to interfere with the contracts and client relations and prevent competition of and by PBS and Gulf Coast. Thus, summary judgment in favor of Defendants on these counts is inappropriate." [DE 278 at 13]. In their reply, Defendants simply argue that "[n]o reasonable jury would believe that there was ever an agreement between Gene, Evan and anyone else in December 2018 to do anything legal or not in view of the circumstances that were present at that time." [DE 284 at 8].

First, the Court finds that summary judgment should be granted in favor of Ben Chevere on Count X. The Court has reviewed ¶¶ 52, 53, 57, and 79 of Plaintiffs' Counter-Statement of Material Facts in Support of Plaintiffs' Motion for Partial Summary Judgment [DE 279] and Robert Saltsman's averment that, "before Matrix was ever formed, Gene and Evan obtained assurance from Ben Chevere that Ben would send the business of Advanced Dermatology Gene and Evan's way should they leave Gulf Coast." [DE 278 at 13 (citing Affidavit of Robert Saltsman ¶13, DE 279-16)]. These facts do not amount to an agreement between Mr. Chevere and others to do something legal in an <u>illegal</u> manner or do something <u>illegal</u> or the doing of some overt act in pursuance of the conspiracy. Moreover, as previously explained in this Order, the evidence does not support a finding that Chevere tortiously interfered with Plaintiffs' business. Thus, summary judgment shall be granted in favor of Ben Chevere.

However, the Court agrees with Plaintiffs that, as to Evan Saltsman and Gene Saltsman, in light of Robert Saltsman's averments in his affidavit [Robert Saltsman Aff. ¶¶ 4-16, DE 279-16] and ¶¶ 52 through 75 of Plaintiffs' Counter-Statement of Material Facts in Support of Plaintiffs' Motion for Partial Summary Judgment [DE 279], a jury could reasonably conclude that Evan and Gene conspired to interfere with contracts and prevent competition. The fact that Evan Saltsman was not an "Affiliate" does not matter because one of his co-conspirators—Gene Saltsman—was

party to the agreements and restrictive covenants. Moreover, Defendants have failed to meet their burden in their motion for summary judgment. Accordingly, Count X shall proceed to trial only against Evan Saltsman and Gene Saltsman.

G. Count XI: Violation of FDUTPA - F.S. § 501.201 *et. seq.* (against Gene Saltsman, Evan Saltsman, Alfatwo Holdings, Inc., Matrix and Chevere)

Plaintiffs' motion:

Plaintiffs have labeled this portion incorrectly and state: "Plaintiffs are Entitled to Summary Judgment as to Count IX (FDUTPA)." However, it appears that they actually intended to reference Count XI. [DE 259 at 19]. Plaintiffs argue that they are entitled to summary judgment "because of the per se violation of FDUTPA under F.S. § 501.203 for violation of the Revised LLC Act" and, or alternatively "because of the character of the aforesaid breaches by Defendants (as discussed above) of the PBS Operating Agreement covenants of non-competition and non-solicitation of Gulf Coast customers, prospective customers, employees and contractors, meet FDUTPA's statutory definition of unfair and deceptive misconduct." *Id.* at p. 20.

In response, Defendants argue that the record evidence regarding Gene's sale of the two pieces of medical equipment "confirm[s] that those sales did not constitute unfair competition, an unconscionable act or practice, or otherwise constitute unfair or deceptive acts or practices." [DE 273 at 21]. Furthermore, Defendants contend that there is no record evidence of any damage to consumers and Plaintiffs themselves were not consumers. *Id.* at 21-22. Defendants are seeking summary judgment in Evan's, Gene's, Alfatwo's and Matrix's favor pursuant to Rule 56(f). *Id.* at 2, 4, 22.

In their reply, Plaintiffs state, "[d]amages to MAC 15 and PBS are recoverable under FDUTPA, which does not restrict recovery to public consumers because business to business torts are compensable under FDUTPA." [DE 259 at 7].

Defendants' motion:

Defendants argue that Chevere, Gene, and Alfatwo are entitled to judgment on the Plaintiffs' FDUTPA claim as a matter of law "because the record evidence establishes that neither of them were conducting any trade or commerce. The record evidence establishes that Gene and Alfatwo were not operating in the same Trade or Business as the Plaintiffs after February 2019 when Gene's employment agreement with the Plaintiffs expired. Mr. Chevere is not a competitor of the Plaintiffs, but rather, was a customer." [DE 197 at 17]. Defendants further argue that there is "no record evidence of any damages to *consumers*" since Plaintiffs are not consumers. *Id.* at 18. Finally, Defendants claim that Plaintiffs' injunctive relief claim "also fails because there is no evidence of consumer harm." *Id.* at 19.

Plaintiffs argue in response that Defendants are "not entitled to summary judgment on Count XI (i) because of their own per se violation of FDUTPA under F.S. § 501.203(3)3 for violation of the Revised LLC Act and, or alternatively (ii) because of the character of the aforesaid breaches by Defendants . . . of the PBS Operating Agreement covenants of non-competition and non-solicitation of Gulf Coast customers, prospective customers, employees and contractors, meet FDUTPA's statutory definition of unfair and deceptive misconduct." [DE 278 at 14]. Plaintiffs also argue that they have sustained actual damages as a result of the misconduct. *Id.*

In reply, Defendants assert that "[a]ll of the Defendants are entitled to Summary Judgment on the FDUTPA claim because: (a) there was no harm to consumers as is required by FDUTPA; and (b) there is no genuine issue of material fact as to whether any of the Defendants did anything

unfair or deceptive, as required by the statute. Evan was not bound by any of the restrictive covenants in the Stock Purchase Agreement or the Partners Operating Agreement." [DE 284 at 11]. Defendants further contend that Gene did not violate any of the restrictive covenants he may have been bound by, and Chevere did nothing except rightfully take Advanced Derm's business away from Gulf Coast. *Id.* at 11-12.

To prevail on a FDUTPA claim, a plaintiff must show (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages. *State Farm Mut. Auto. Ins. Co. v. Performance Orthapaedics & Neurosurgery, LLC*, 315 F. Supp. 3d 1291, 1300 (S.D. Fla. 2018) (citing *Hucke v. Kubra Data Transfer, Corp.*, 160 F.Supp.3d 1320, 1328 (S.D. Fla. 2015)). "A deceptive act or practice is 'one that is likely to mislead consumers and an unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Hucke*, 160 F.Supp.3d at 1328.

For the first element of the FDUTPA claim, a plaintiff may allege either a traditional or *per se* violation. *Felice v. Invicta Watch Co. of Am., Inc.*, No. 16-CV-62772, 2017 WL 3336715, at *2 (S.D. Fla. Aug. 4, 2017). To establish a traditional FDUTPA violation, the plaintiff must show that the defendant engaged in "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1); *Feheley v. LAI Games Sales, Inc.*, No. 08-cv-23060, 2009 WL 2474061, at *5 (S.D. Fla. Aug. 11, 2009). A *per se* violation can be established in two ways: (1) if the "law, statute, rule, regulation, or ordinance" expressly constitutes a violation of the FDUTPA or (2) the statute, rule or ordinance proscribes unconscionable, deceptive, or unfair acts or practices and therefore operates as an implied FDUTPA predicate. Fla. Stat. § 501.203(3)(c); *Parr v. Maesbury Homes, Inc.*, No. 09-cv-1268, 2009 WL 5171770, at *7 (M.D. Fla. Dec. 22, 2009). Though a violation of

36

a predicate statute satisfies the first element of the FDUTPA claim, a party is still required to plead causation and damages. *Parr*, 2009 WL 5171770, at *8.

FDUTPA is to be construed "liberally" to promote its underlying policies. Fla. Stat. § 501.202. In order to have standing to recover damages under FDUTPA, a claimant must be a "person," and "anyone aggrieved" by a FDUTPA violation may seek declaratory or injunctive relief. *See* Fla. Stat. § 501.211(2) (conferring standing on "a person who has suffered a loss as a result of a violation of this part") and § 501.211(1). "Under Florida law, a party need not be a consumer to bring a FDUTPA claim." *Bluegreen Vacations Unlimited, Inc. v. Timeshare Termination Team, LLC*, No. 20-CV-25318, 2021 WL 2476488, at *6 (S.D. Fla. June 17, 2021) (citing *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164, 166-69 (Fla. 4th DCA 2015)).

First, based on the above case law, the Court rejects Defendants' position that "Plaintiffs were not consumers in this context," and their concomitant argument that summary judgment should be granted in Defendants' favor on such basis as to Count XI. Next, as the Court declined to grant summary judgment in favor of Plaintiffs or in favor of Gene Saltsman or Alfatwo Holdings on the breach of contract claims and the asserted violation of the Revised LLC Act, the Court shall also deny summary judgment as to Plaintiffs and as to Gene and Alfatwo as to Count XI. This is because Plaintiffs' entire FDUPTA claim hinges on either (1) breaches of contract by Gene and Alfatwo or (2) their *per se* violation of the statute.

The Court shall, however, grant summary judgment in favor of Evan, Matrix, and Chevere as to Count XI as a matter of law. Matrix could not be an affiliate under the contracts if Evan was not an affiliate. Thus, Matrix and Evan were not parties to the contracts and therefore could not have breached them for the reasons stated above. Additionally, Plaintiffs make no arguments about

37

Chevere as to Count XI in their motion for summary judgment [DE 259 at 19-20] or in their response to Defendants' motion for summary judgment. [DE 278 at 13-14]. Therefore, they have waived any argument as to Chevere. Furthermore, Plaintiffs have cited to no evidence whatsoever that supports a FDUTPA claim against Chevere. Accordingly, Count XI shall proceed to trial only against Gene and Alfatwo.

> H. Count XII: Violation of the Defend Trade Secrets Act - 18 U.S.C. § 1836 *et. seq.* (against Gene Saltsman, Evan Saltsman, Alfatwo Holdings, Inc., Matrix and Chevere)

In their motion for summary judgment, Defendants assert that "[t]here is no question that Gulf Coast transferred all of its tangible and intangible personal property, including its purported customer list, to Perkins on July 1, 2019. Thus, anything Partners owned, other than claims which are not trade secrets, was lost when all of the assets of Gulf Coast were sold to Perkins. This irrefutable fact is fatal to the Plaintiffs' claim under the DTSA." [DE 197 at 20]. Next, Defendants argue that Plaintiffs' purported customer list and business plan were not trade secrets and contained readily identifiable information, that Plaintiffs failed to protect the secrecy of the information, and that the purported customer list and purported business plan were not misappropriated. *Id.* at 21-27.

Plaintiffs argue in response that they took significant preventative measures to "ensure the customer and employee and contractor lists of Gulf Coast were considered confidential trade secrets from the beginning of negotiations." [DE 278 at 15]. They contend that client lists, customer lists, vendor lists, etc., "as defined by the SPA and the PBS Operating Agreement, as well as in the Post-Org Agreement," constitute confidential information considered trade secrets under the DTSA. *Id.* at 18. Further, they argue that as "all the parties considered the client lists and the employee and contractor lists to be confidential, and where the sworn testimony and record

evidence establish that Defendants did in fact take, use and transmit information PBS considered highly confidential trade secrets, summary judgment in favor of Defendants is not appropriate." *Id.* at 19. According to Plaintiffs, "at best for Defendants, there are issues of material fact whether the Defendants have violated the DTSA or Plaintiffs have not satisfied the DTSA. Given the record evidence, however, Plaintiffs respectfully submit that summary judgment is appropriate in favor of Plaintiffs on this Count XII because Plaintiffs have established, without rebuttal, the ultimate facts to support Count XII." *Id.*

In reply, Defendants contend that Gene, Evan, Alfatwo, Chevere, and Matrix are entitled to summary judgment on Count XII, because, even if the purported customer list or the draft executive summary is considered a business plan and, thus, a trade secret, "all of Gulf Coast's tangible and intangible personal property was sold to Perkins prior to this lawsuit being filed." [DE 284 at 12]. Therefore, "Plaintiffs did not own the alleged trade secrets as is required under federal law, or possess the alleged trade secrets as required under state law." *Id.* According to Defendants, Plaintiffs did not address this argument in their response. *Id.*

The DTSA defines the term "trade secret" as

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, program, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—(a) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 USC § 1839(3).

The DTSA permits an "owner of a trade secret that is misappropriated" to bring a civil

action "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 USC § 1836(b). The DTSA defines "misappropriation" as

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who—(i) used improper means to acquire knowledge of the trade secret; (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—(I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that—(I) the trade secret was a trade secret; and (II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. §1839(5).

Pursuant to the Bill of Sale dated July 1, 2019, Gulf Coast Biomedical, LLC, undisputedly sold to Perkins Biomedical Services, LLC, its "intangible property comprised of Seller's customer lists…phone numbers, web hosting, account and Customer service information and other intangible property used in its business all as more fully detailed on the Intangible Property List attached…." [DE 197-6]. In exchange, Perkins paid Gulf Coast $1,000 with a "promise to pay an additional $2,000.00 in equal annual installments on the 1st and 2nd anniversary dates of the execution" of the Bill of Sale. *Id.* Attached as Exhibit A to the Bill of Sale is a 10-page customer list. *Id.* There is also a second Bill of Sale that deals with "spare parts inventory, equipment for resale inventory and other personal property used in its business" in exchange for payment in the amount of $75,000. *Id.*

In light of the record evidence, it is undisputed that Plaintiffs do not own the alleged trade secrets. Furthermore, Plaintiffs make absolutely no argument that they do, in fact, own the alleged trade secrets in their response to Defendants' motion for summary judgment. This constitutes

40

waiver on behalf of Plaintiffs. Nor do Plaintiffs include any relevant facts about the sale to Perkins or Plaintiffs' ownership of the alleged trade secrets in their various statements of material facts. In light of the fact that the DTSA only permits the "owner" of the trade secrets to bring a civil action and in light of the fact that the undisputed, uncontroverted evidence establishes that Plaintiffs no longer own the alleged trade secrets, summary judgment shall be granted in favor of Gene Saltsman, Evan Saltsman, Alfatwo Holdings, Inc., Matrix and Chevere as to Count XII.

The Court also notes that, even if Plaintiffs had established ownership, the Court would have granted summary judgment in favor of Evan, Matrix, and Chevere for the following reasons. With regard to Evan Saltsman, Plaintiffs argue that he was bound by the various contracts to keep the customer list and business plan confidential. The Court has already found that Evan was not, in fact, bound by those contracts because he did not fit without the plain meaning of the term "Affiliate." There is no factual basis to support Count XII against Evan, and summary judgment should be granted in his favor as a matter of law. Summary judgment must similarly be granted as to Matrix as a matter of law as it was not bound by the contracts. Finally, with regard to Chevere, summary judgment must be granted as a matter of law given the record evidence and because Plaintiffs have failed to raise any argument about Chevere in their response and have therefore waived any such argument.

In sum, summary judgment shall be granted in favor of all Defendants on Count XII. This Count shall not proceed to trial.

I. <u>Count XIII: Violation of the Florida Uniform Trade Secrets Act - F.S. § 688.001 *et. seq.* (against Gene Saltsman, Evan Saltsman, Alfatwo Holdings, Inc., Matrix and Chevere)</u>

In their motion for summary judgment, Defendants assert that "Partners owned nothing other than Gulf Coast. Thus Plaintiffs, by virtue of its ownership of Gulf Coast, did not possess a

purported customer list once Gulf Coast's 'list' was sold to Perkins. Just as Plaintiffs' DTSA claim must fail, its FUTSA claim must also fail. Plaintiffs cannot sue to protect something they did not possess at the time the lawsuit was commenced." [DE 197 at 21]. Next, Defendants argue that Plaintiffs' purported customer list and business plan were not trade secrets and contained readily identifiable information, that Plaintiffs failed to protect the secrecy of the information, and that the purported customer list and purported business plan were not misappropriated. *Id.* at 21-27.

Plaintiffs argue in response that, for the same reasons set forth above with respect to the DTSA claim above, "at best for Defendants, there are genuine issues of material fact that militate against summary judgment in favor of Defendants on the FUTSA claim. Alternatively, the Court may, however, find it appropriate to render summary judgment in favor of Plaintiffs on the FUTSA claim, given the unrebutted, record evidence of violation of FUTSA." [DE 278 at 20].

In reply, Defendants contend that Gene, Evan, Alfatwo, Matrix, and Chevere are entitled to summary judgment on Count XII, because, even if the purported customer list or the draft executive summary is considered a business plan and, thus, a trade secret, "all of Gulf Coast's tangible and intangible personal property was sold to Perkins prior to this lawsuit being filed." [DE 284 at 12]. Therefore, "Plaintiffs did not own the alleged trade secrets as is required under federal law, or possess the alleged trade secrets as required under state law." *Id.* According to Defendants, Plaintiffs did not address this fact in their Response. *Id.*

Florida law defines a trade secret as

information, including a formula, pattern, compilation, program, device, method, technique, or process that (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

42

Fla. Stat. § 688.002(4). "Misappropriation" is defined as

> Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (b) Disclosure or use of a trade secret of another without express or complied consent by a person who 1. Used improper means to acquire knowledge of the trade secret; of 2. At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was: a. Derived from or through a person who had utilized improper means to acquire it; b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limited its use; or c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or 3. Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Fla. Stat. 688.022(2). To prove a claim under the Florida Uniform Trade Secrets Act (FUTSA), a plaintiff "must demonstrate that (1) it possessed a trade secret and (2) the secret was misappropriated." *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1297 (11th Cir. 2018) (quotation and quotation marks omitted).

Applying the same analysis to Count XIII as the Court applied to Count XII—that Plaintiffs do not own the trade secrets—the Court will grant summary judgment in favor of Evan, Matrix, Chevere, Gene, and Alfatwo as to Count XIII as a matter of law. This Count shall not proceed to trial.

J. Count XIV: Unjust Enrichment and Disgorgement (against Gene Saltsman, Evan Saltsman, Alfatwo Holdings, Inc., Matrix and Chevere)

Plaintiffs' motion:

Plaintiffs move for summary judgment on Count XIV but do not discuss it at all in their motion other than mentioning it in the very beginning when they list the counts upon which they are moving for summary judgment. [DE 259 at 1].

In response, Defendants first argue that Evan and Matrix were not parties to any of the agreements regarding the Transaction and never received any money or anything of value from

43

Alfatwo. [DE 273 at 23]. Moreover, there is no evidence in the record supporting Plaintiffs' allegation that Gene ever shared any part of the Loan with Evan and Matrix, and, in fact, the evidence contradicts such an allegation. *Id.* Defendants explain that Gene and Alfatwo did obtain a benefit--the $500,000 which was a part of the purchase price for the sale of his business Gulf Coast. *Id.* They accuse Plaintiffs of acting in bad faith and committing multiple material breaches of contract. *Id.* Additionally, Defendants argue that the "benefit" Gene received from the Transaction does not make up for the fact that he lost his ability to collect the remaining $2,500,000.00 (the loss of the value of his 19.99% interest in PBS) as a result of the Plaintiffs' bad faith actions and does not make up for the loss of his business, which was generating $2,000,000 in gross revenue annually. *Id.* Defendants are seeking summary judgment in Evan's, Matrix's, Gene's and Alfatwo's favor pursuant to Rule 56(f). *Id.* at 2-3, 23.

In reply, Plaintiffs state that, in 2019, Gene and Evan, together with the other Defendants, diverted to Evan's Matrix company over 56% of the PBS/Gulf Coast 2018 customer revenue ($1,251,000), and caused additional loss of customer revenue to PBS/Gulf Coast in the amount of $192,000. [DE 291 at 6]. Thus, Defendants caused PBS/Gulf Coast to lose over 65% of customer revenue in 2019, and they have provided no evidence to rebut the diversion or loss of over 65% of those 2018 sales. *Id.*

Defendants' motion:

Defendants argue in their motion for summary judgment that there is absolutely no evidence in the record that Chevere, Evan, or Matrix ever received any benefit from the $750,000 loan made by PBS or Plaintiffs' assumption of the obligations. [DE 197 at 27]. Defendants also argue that Chevere, Evan, and Matrix were not involved in the transaction whereby PBS purchased Gulf Coast. *Id.* at 28. Defendants further contend that none of the parties wrongfully competed

with Plaintiffs by improperly diverting customers. *Id.*

In response, Plaintiffs provide no factual argument or reference to the elements but state that "[t]he aforesaid unrebutted record evidence establishes the common law and statutory misconduct by Gene, Evan, Alfa Two and Matrix. That misconduct renders summary judgment in favor of Plaintiffs entirely appropriate, but at the very least, raises genuine issues of material fact that militates in favor of summary judgment in favor of Defendants on this claim." [DE 278 at 20].

In reply, Defendants argue that none of them except for Gene Saltsman "ever received anything of value from the Plaintiffs. As a matter of law, they cannot be unjustly enriched." [DE 284 at 12-13].

Under Florida law, "[t]he elements of a cause of action for unjust enrichment are: (1) plaintiff conferred a benefit on the defendant who, has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." *Perez v. Salmeron*, 307 So. 3d 927 (Fla. 3d DCA 2020) (quoting *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 693 (Fla. 3d DCA 2018)); *In re Diamond Tr. u/a/d 10/28/2005*, No. 16-CV-81923, 2021 WL 2404337, at *4 (S.D. Fla. May 10, 2021). Disgorgement is an equitable remedy that is intended to prevent unjust enrichment and is measured by a defendant's ill-gotten profits or gains rather than a plaintiff's losses. *S.E.C. v. Monterosso*, 756 F.3d 1326, 1337 (11th Cir. 2014); *S.E.C. v. Levin*, 849 F.3d 995, 1006 (11th Cir. 2017).

The Court has carefully reviewed the papers regarding Count XIV and notes that Plaintiffs have cited no record evidence in support of their own motion or in support of the arguments made in their response to Defendants' motion. Plaintiffs' motion for summary judgment must be denied as to Count XIV as they have not met their burden.

Next, Plaintiffs have cited no evidence whatsoever that establishes that Plaintiffs conferred a benefit on Matrix, Evan, or Chevere. And, the Court has already determined that Evan and Matrix were not parties to any relevant agreements. Moreover, Chevere clearly was not a party to any relevant agreement. Therefore, summary judgment shall be granted as a matter of law in favor of Evan, Matrix, and Chevere as to Count XIV.

Defendants concede that Gene and Alfatwo did obtain a benefit, i.e., the $500,000 which was a part of the purchase price for the sale of Gene's business, Gulf Coast, but argue that the bad faith and multiple, material breaches of contract were on Plaintiffs' part (not on Defendants' part). Defendants also assert that the benefit Gene received from the Transaction does not make up for what he lost, i.e., the ability to collect the remaining $2,500,000.00, the loss of the value of his 19.99% interest in PBS, and the loss of his business, which was generating $2,000,000 in gross revenue annually. Defendants have not pin cited any evidence to support their position. The Court finds that it has no choice but to deny summary judgment as to Gene and Alfatwo. Defendants Gene and Alfatwo have not met their burden to obtain a summary judgment on Count XIV. Accordingly, this Count shall proceed to trial against only Gene and Alfatwo.

## CONCLUSION

Based on the foregoing, it is hereby **ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment [DE 197] is GRANTED IN PART AND DENIED IN PART. It is also hereby ORDERED AND ADJUDGED that Plaintiffs' Motion for Summary Judgment or Partial Summary Judgment [DE 259] is DENIED. The Court does find that summary judgment should be granted as to the following counts and parties:

A. Count I: Summary judgment is entirely denied. Count I shall proceed to trial only against Gene Saltsman.

B. Count II: Summary judgment is granted in favor of Evan Saltsman. Count II shall proceed to trial only against Gene Saltsman and Alfatwo.

C. Count IV: Summary judgment is granted in favor of Evan Saltsman. Count IV shall proceed to trial only against Gene Saltsman and Alfatwo.

D. Count VIII: Summary judgment is granted in favor of Evan Saltsman, Ben Chevere, Matrix, and Alfatwo. Count VIII shall proceed to trial only against Gene Saltsman.

E. Count IX: Summary judgment is granted in favor of Evan Saltsman, Gene Saltsman, Matrix, and Alfatwo. Count IX shall not proceed to trial.

F. Count X: Summary judgment is granted in favor of Ben Chevere. Count X shall proceed to trial only against Gene Saltsman and Evan Saltsman.

G. Count XI: Summary judgment is granted in favor of Evan Saltsman, Matrix, and Ben Chevere. Count XI shall proceed to trial only against Gene Saltsman and Alfatwo.

H. Count XII: Summary judgment is granted in favor of Gene Saltsman, Evan Saltsman, Alfatwo Holdings, Inc., Matrix and Chevere. Count XII shall not proceed to trial.

I. Count XIII: Summary judgment is granted in favor of Gene Saltsman, Evan Saltsman, Alfatwo Holdings, Inc., Matrix and Chevere. Count XIII shall not proceed to trial.

J. Count XIV: Summary judgment is granted in favor of Matrix, Evan Saltsman, and Ben Chevere. Count XIV shall proceed to trial only against Gene Saltsman and Alfatwo.

The remaining counts and parties shall proceed to jury trial. All pending issues shall be resolved at the upcoming jury trial where the trier of fact will have an opportunity to hear and consider all the relevant and probative evidence and make credibility determinations.

The case is specially set for a two-week jury trial beginning on Monday, October 25, 2021, at 9:00 a.m. before United States Magistrate Judge William Matthewman at the U.S. Courthouse located at 701 Clematis Street, Courtroom Six, Third Floor, West Palm Beach, Florida. The parties and their counsel shall be ready and present for the jury trial at that time. The parties are also

reminded that a calendar call is set for 1:15 p.m. on October 20, 2021, before the undersigned at the same location.

**DONE and ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 17th day of September, 2021.


WILLIAM MATTHEWMAN
United States Magistrate Judge